# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **LONZY C. OWENS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:05cv00038 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART**, | ) | |
| Commissioner of Social Security, | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

Plaintiff, Lonzy C. Owens, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C.A. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C.A. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

-1-

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Owens protectively filed applications for DIB and SSI on or about July 17, 2002, alleging disability as of April 21, 2000, based on hypertension, regional ileitus,[1] degenerative disc disease, rheumatoid arthritis, bulging discs in the neck, pinched nerves in the neck, asthma, emphysema, continual pain in middle and lower back, depression, anxiety, tension, agitation, continual pain in the neck and numbness in the left outside arm from the shoulder to the elbow, the right little finger and the adjacent edge of the palm of the right hand up to the wrist. (Record, ("R."), 62-65, 78, 85, 245-47.) Owens's claims were denied both initially and on reconsideration. (R. at 35, 37-39, 40-42, 46-47, 249-51.) Owens requested a hearing before an administrative law judge, ("ALJ"), (R. at 43), and this hearing was held on May 5, 2004, at which Owens was represented by counsel. (R. at 257-97.)

By decision dated June 22, 2004, the ALJ denied Owens's claims. (R. at 17-26.) The ALJ found that Owens met the disability insured status requirements of the

---

[1]Regional ileitus refers to Crohn's disease affecting the distal portion of the small intestine. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 816 (27th ed. 1988).

-2-

Act for disability purposes through the date of the decision. (R. at 25.) The ALJ found that Owens had not engaged in substantial gainful activity since April 21, 2000. (R. at 25.) The ALJ also found that Owens had severe impairments, namely cervical radiculopathy, degenerative osteoarthritis of the left shoulder joint, degenerative disc disease of the lumbar spine and chronic obstructive pulmonary disease, ("COPD"),[2] but he found that Owens did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25.) The ALJ further found that Owens's allegations regarding his limitations were not totally credible. (R. at 25.) The ALJ found that Owens retained the residual functional capacity to perform light work,[3] diminished by an ability to only occasionally climb, balance, stoop, kneel, crouch and crawl, an inability to sustain steady extension of the left arm, a limited ability to write with the dominant hand, an inability to repetitively turn, flex and extend the arms bilaterally and a need to avoid extreme temperatures, humidity, fumes and allergens. (R. at 25.) Thus, the ALJ found that Owens could perform his past relevant work as a teacher. (R. at 25.) The ALJ further found that Owens was not disabled as defined by the Act and was not eligible for benefits. (R. at 25-26.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2005).

After the ALJ issued his decision, Owens pursued his administrative appeals, (R. at 13), but the Appeals Council denied his request for review. (R. at 6-9.) Owens then filed this action seeking review of the ALJ's unfavorable decision, which now

---

[2]COPD is a chronic lung disease, such as asthma or emphysema, in which breathing becomes slowed or forced. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"),157 (1995).

[3]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). This case is before this court on Owens's motion for summary judgment filed September 26, 2005. Based on the decision set forth below, I dispense with the requirement that the Commissioner file written legal arguments in this matter.

## *II. Facts and Analysis*

Owens was born in 1944, (R. at 63, 245), which classifies him as a person of advanced age under 20 C.F.R. §§ 404.1563(e), 416.963(e) (2005). He has a college education and a master's degree in education. (R. at 84, 263.) He has past relevant work experience as a teacher, a college professor, an electrician's helper and an industrial construction foreman. (R. at 87, 265-72.)

At his hearing, Owens testified that he last worked in 2000 as a foreman in a clean room for approximately four and one-half years. (R. at 265, 267.) He stated that he had to quit after being involved in a motor vehicle accident that resulted in a dislocated shoulder and scrapes and cuts to the head, right ear and left elbow. (R. at 267, 274.) Owens further testified that he had suffered from chronic neck pain since the accident. (R. at 274.) He stated that he had not attempted to return to work since that time. (R. at 271.) Owens further stated that his abilities to read and write had diminished since the accident, noting that his hands cramped and would "lock up" on him when he tried to write. (R. at 272-73.) He further testified that he had been diagnosed with depression, which affected his ability to concentrate. (R. at 273.) He testified that he had been diagnosed with back problems, degenerative disc disease with radiculopathy, osteoarthritis of the left shoulder, COPD, emphysema, asthma, a fixed airway obstruction, pulmonary hyperinflation, an anxiety disorder, depression,

-4-

Case 1:05-cv-00038-PMS   Document 15   Filed 10/13/05   Page 4 of 18   Pageid#: 37

hypertension and regional ileitis. (R. at 275-76.)

Owens testified that he experienced anxiety while he was teaching and "probably a little bit" of depression. (R. at 277.) He stated that some of the other teachers thought that he was "odd." (R. at 277.) Owens testified that after his last teaching job in 1995, he interviewed for other teaching jobs, but never got called back. (R. at 278.) He stated that the interviews made him anxious and nervous. (R. at 278.)

Owens testified that surgery for his back had not been recommended. (R. at 279.) However, he stated that if knew that surgery would work, he would do it. (R. at 279.) Owens testified that he had not regained full use of his shoulder since the motor vehicle accident in 2000. (R. at 279.) He stated that he had participated in physical therapy three separate times, but to no avail. (R. at 279-80.) Owens testified that his asthma bothered him every day, and he further stated that he had been informed that it would probably worsen. (R. at 282.) He testified that he had difficulty lifting due to his impairments. (R. at 283.) Owens further testified that he had difficulty concentrating, following both simple and detailed instructions and tolerating fellow employees, supervisors and the general public. (R. at 286.)

Michael R. Gore, a vocational expert, also was present and testified at Owens's hearing. (R. at 287-97.) Gore classified Owens's past work as an elementary school teacher, as a teacher for children with learning disorders, as a high school teacher and as a college professor all as light and skilled, as an electrician's helper and as a

supervisor as medium[4] and semiskilled and as an industrial cleaner as medium and unskilled. (R. at 288-89.) Gore was asked to assume a hypothetical individual of Owens's age, education and past work experience, who retained the functional capacity to perform light work, but who could perform postural activities only occasionally, who could not sustain steady extension of the left dominant arm, who had a diminished ability to write with the dominant hand, who could not repetitively turn, flex or extend the arms bilaterally and who should avoid temperature extremes, humidity, allergens and fumes. (R. at 289-91.) Gore testified that such an individual could perform the job of a teacher, as long as he would not have to stand for more than six hours in an eight-hour workday. (R. at 294.)

In rendering his decision, the ALJ reviewed records from Tazewell Community Hospital; Dr. Paul Lallande, O.D.; Tri-County Health Clinic; Dr. T. Patel, M.D.; Dr. German Iosif, M.D.; Dr. Donald R. Williams, M.D., a state agency physician; Eugenie Hamilton, Ph.D., a state agency psychologist; Dr. Joseph Claustro, M.D.; Dr. Gary Parrish, M.D., a state agency physician; and Hugh Tenison, Ph.D., a state agency psychologist.

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the

---

[4]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2005).

requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

-7-

Case 1:05-cv-00038-PMS   Document 15   Filed 10/13/05   Page 7 of 18   Pageid#: 40

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d),416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

In his brief, Owens argues that the ALJ erred by failing to find that he suffered from a severe mental impairment, particularly, by rejecting the opinion of Dr. Patel, his treating physician. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-9.) Owens also argues that the ALJ erred by failing to consider his impairments in combination in determining that he was not disabled. (Plaintiff's Brief at 9-10.)

Owens first argues that the ALJ erred by failing to find that he suffered from a severe mental impairment, particularly, by rejecting the opinion of Dr. Patel, his treating physician. (Plaintiff's Brief at 6-9.) However, for the following reasons, I find that the ALJ's findings are supported by substantial evidence.

It appears that the first mention of any mental condition occurred on August 21, 2001, nearly a year and a half after the date of alleged onset of disability, during Owens's initial assessment at Tri-County Health Clinic, ("Tri-County"). (R. at 160.)

At that time, Owens reported anxiety and depression. (R. at 160.) However, no description of symptoms related thereto was included in the treatment note, nor did the treating source include any findings regarding this alleged anxiety and depression. (R. at 160.) Nonetheless, Owens was diagnosed with anxiety and was prescribed Zoloft. (R. at 161-62.)

On January 30, 2003, Owens did not state that he was taking Zoloft or any other psychotropic medication when asked about his medications by Dr. German Iosif, M.D. (R. at 176.) Dr. Iosif noted that Owens was alert and oriented, and he reported that his long- and short-term memory and mood were unremarkable. (R. at 177.) On March 12, 2003, Eugenie Hamilton, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), concluding that Owens suffered from a nonsevere anxiety-related disorder with coexisting nonmental impairments that required referral to another medical specialty. (R. at 190-204.) Hamilton found that Owens experienced no restriction on his activities of daily living, had only mild difficulty maintaining social functioning, experienced no difficulties maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 200.) Hamilton opined that Owens's mental symptoms and allegations were only minimally credible. (R. at 202.) Finally, Hamilton noted that Owens's activities of daily living were restricted mainly due to his physical complaints. (R. at 204.)

Owens was again seen at Tri-County from March 5, 2002, through May 20, 2003. (R. at 208-15.) The only information relevant to Owens's alleged mental condition contained in these treatment notes appears to be consistent refills of Zoloft.

(R. at 208-15.) However, as noted earlier, no subjective complaints by Owens nor any findings by the treating source related to anxiety or depression are contained in these notes for this period of time. (R. at 208-15.)

Hugh Tenison, Ph.D., another state agency psychologist, completed a PRTF on August 25, 2003, concluding that Owens suffered from a nonsevere affective disorder and a nonsevere anxiety-related disorder. (R. at 223-35.) Tenison found that Owens was only mildly restricted in his activities of daily living, experienced no difficulties in maintaining social functioning or in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation. (R. at 233.) Tenison opined that Owens's subjective allegations regarding his mental condition were only partially credible. (R. at 235.)

On May 4, 2004, Dr. T. Patel, M.D., completed a mental assessment, indicating that Owens had a fair ability to deal with work stresses, to function independently, to understand, remember and carry out detailed and complex job instructions and to demonstrate reliability.[5] (R. at 236-38.) Dr. Patel concluded that Owens had a poor or no ability to maintain attention and concentration. (R. at 236.) However, in the majority of areas of adjustment, Dr. Patel found that Owens had an unlimited or very good ability. (R. at 236-37.) Interestingly, Dr. Patel noted that there were no medical or clinical findings to support his assessment. (R. at 237.)

Owens was again seen at Tri-County from June 16, 2003, through April 6,

---

[5]I note that Dr. Patel actually checked the line for both "unlimited/very good" and "fair" regarding Owens's ability to interact with supervisors. (R. at 236.)

-10-

2004. (R. at 240-44.) The treatment notes again reveal Zoloft refills without any mention of anxiety- or depression-related symptoms or findings related thereto. (R. at 240-41, 243-44.)

Given Owens's lack of mental health treatment, aside from medication refills, his very minimal complaints regarding any alleged mental impairment, the state agency psychologists' findings that Owens suffered from nonsevere mental impairments and the imposition of very minimal restrictions on Owen's mental abilities, I find that substantial evidence supports the ALJ's finding that Owens did not suffer from a severe mental impairment. I further note that, although Owens contends that Dr. Patel, a physician with Tri-County, is his treating physician, it appears that Owens consistently saw nurse practitioners there. In fact, it is unclear from the treatment notes contained in the record whether Owens ever actually saw Dr. Patel. In any event, neither the notes from Tri-County nor Dr. Patel's mental assessment, in which he found that Owens retained an unlimited or very good ability in the majority of adjustment areas, supports a finding that Owens has a severe mental impairment.

I will next address Owens's argument that the ALJ erred by failing to consider his physical and mental impairments in combination. (Plaintiff's Brief at 9-10.) Again, I find that substantial evidence supports the ALJ's findings.

The record reveals that Owens was involved in a motor vehicle accident on April 21, 2000, resulting in a dislocated left shoulder and abrasions and lacerations of the left elbow and fingers. (R. at 127-32, 143.) He underwent a successful shoulder

-11-

reduction. (R. at 143.) Thereafter, Owens complained of shoulder pain, back pain and neck pain. An MRI of the lumbar spine taken on May 27, 2000, revealed small herniated nuclear pulposuses at the C3-4 and C4-5 levels, a disc protrusion at the C6-7 level and hypertrophic degenerative disease. (R. at 141.) On May 24, 2000, Owens was seen at the Department of Physical Therapy And Work Rehabilitation at Tazewell Community Hospital for an evaluation. (R. at 139-40.) He complained of bilateral shoulder pain, left greater than the right, intermittent numbness in the left hand with no focal neurological distribution, numbness in the lateral upper arm, numbness in the right hand and cervical pain and pain in the low back with no radicular symptoms. (R. at 139.) A physical examination revealed decreased strength with left shoulder flexion, extension, abduction, internal rotation and external rotation. (R. at 139.) However, Owens's bilateral upper and lower extremity reflexes were normal. (R. at 139.) He exhibited a decreased range of motion of the left shoulder. (R. at 139.) Owens was diagnosed with adhesive capsulitis[6] on the left shoulder post dislocation and radicular numbness in the right C8 dermatome and the left C5 dermatome with no associated reflex or motor impairment. (R. at 140.) It was further noted that Owens had a very limited range of motion of the left shoulder and elbow that would prevent him from performing most activities of daily living that required lifting, reaching and holding with the left hand. (R. at 140.) Finally, it was noted that Owens had cervical and lumbar pain. (R. at 140.) He was scheduled to participate in physical therapy three times weekly for two weeks. (R. at 140.)

---

[6]Adhesive capsulitis refers to an adhesive inflammation between the joint capsule and the peripheral articular cartilage of the shoulder with obliteration of the subdeltoid bursa, characterized by painful shoulder of gradual onset, with increasing pain, stiffness and limitation of motion. *See* Dorland's at 267.

Owens underwent physical therapy for his left shoulder from May 24, 2000, through October 15, 2000. (R. at 148-58.) By July 14, 2000, Owens reported that he could use his arm a little bit better, but it was noted that Owens's range of motion was very slowly progressing. (R. at 144, 154.) On July 19, 2000, it was noted that Owens's subjective complaints were greater than the objective findings. (R. at 154.) On August 1, 2000, Owens reported that Flexeril helped him to raise his arm a little higher. (R. at 153.) On October 4, 2000, Owens reported constant pain, but his physical therapy was discontinued on October 15, 2000, for noncompliance. (R. at 145, 148.) The record reveals that from August 30, 2000, through October 15, 2000, Owens either canceled or simply did not appear for physical therapy on at least nine separate occasions. (R. at 148-51.)

Owens was seen at Tri-County from August 21, 2001, through May 20, 2003. (R. at 159-64, 208-15.) On August 21, 2001, he complained of bodily swelling, general all over body aches, headaches, a bulging disc and pinched nerve with pain and degenerative disc disease and numbness in the right arm. (R. at 162.) On November 20, 2001, Owens reported that he did not feel that his arthritis medication was working well. (R. at 164.) Over this time period, Owens was diagnosed with hypertension, low back pain and osteoarthritis of the knees. (R. at 161.) He was prescribed various medications over this time period including dyflex, sulfasalazine, etodolac, furosemide, guanabenz, clonidine, Bidex, Atacand, Lodine, albuterol, hydroxyzine, Vistaril, Azulfidine, catapres, verapamil, Proventil and Celebrex. (R. at 161-64, 208-15.)

Owens saw Dr. Iosif on January 30, 2003, for a physical evaluation at the

-13-

request of Disability Determination Services. (R. at 175-79.) At that time, he reported having experienced constant neck pain that radiated into the lower spine and interscapular area following his motor vehicle accident. (R. at 175.) He further noted that the pain was exacerbated by repetitive turning, flexion or extension movements of the cervical spine and when maintaining one or both upper extremities in an elevated extended position. (R. at 175.) Owens also described a frequent numbness sensation and paresthesias extending from the left shoulder into the arm down to the right little finger. (R. at 175.) He also reported persistent left shoulder pain. (R. at 175.) Although Owens had been diagnosed with asthma, he reported that he was not using a bronchodilator or anti-inflammatory therapy due to the expense. (R. at 176.) He described daily wheezing and coughing exacerbated by exertional activities or exposure to extreme environmental cold or humidity. (R. at 176.)

A physical examination revealed that Owens was slightly hoarse and dyspneic at rest with occasional audible wheezes. (R. at 177.) Somewhat diminished breath sounds were noted throughout both lungs. (R. at 177.) Owens's extremities were without gross joint deformities or inflammation, but there was decreased muscle bulk over the right hypothenar prominence with diminished sensation to touch and pain sensation over the ulnar edge of the right hand and extending distally throughout the little finger. (R. at 177-78.) However, Dr. Iosif reported no significant motor weakness in the right hand and wrist area, and he noted that Owens was able to sustain a strong grip with the right hand. (R. at 178.) Owens's range of motion of the upper and lower extremity joints was unremarkable except for a reduced active and passive

abduction of the right shoulder.[7] (R. at 178.) He also exhibited a limited range of flexion and extension motion of the cervical segment. (R. at 178.) Owens was diagnosed with degenerative disc disease of the cervical spine with chronic pain syndrome and possible compression radiculopathy with involvement of the C6-7 level of the spine on the right side, suggesting irreversible nerve damage at that level. (R. at 178.) Dr. Iosif also diagnosed post-traumatic degenerative osteoarthritis of the left shoulder joint with limited range of motion and moderate to severe persistent asthma with indication of fixed airway obstruction and pulmonary hyperinflation. (R. at 178.)

X-rays of the lumbar spine yielded normal results. (R. at 165.) A chest x-ray revealed moderate COPD changes bilaterally and the thoracic spine was osteoporotic. (R. at 166.) Owens exhibited a decreased range of motion of the cervical spine, left shoulder and left knee. (R. at 167-68.) Dr. Iosif also performed spirometry testing, which revealed mild upper airway obstruction. (R. at 169-74.) However, it was noted that Owens gave a poor initial effort. (R. at 169, 171, 173.)

Dr. Iosif opined that Owens's musculoskeletal conditions and related functional impairments would prevent him from performing his past work in the construction industry. (R. at 178-79.) He further opined that Owens's cervical radiculopathy on the right side would impair his ability to write or maintain a steady extended attitude of his distal upper extremity. (R. at 179.) Finally, Dr. Iosif opined that Owens's untreated asthma could be adversely affected by exposure to extreme environmental conditions or extreme environmental changes or conditions in humidity, temperature,

---

[7]The Range of Motion Form indicates that it was Owens's left shoulder that was limited. (R. at 167.)

-15-

fumes, gases and dust. (R. at 179.)

Dr. Donald R. Williams, M.D., a state agency physician, completed a physical assessment on March 12, 2003, concluding that Owens could perform medium work diminished by a limited ability to push and/or pull with the upper extremities. (R. at 180-89.) He found that Owens could frequently climb stairs, balance, stoop, kneel and crouch, that he could occasionally crawl, but that he could never climb ladders. (R. at 182.) Dr. Williams further found that Owens was limited in his ability to reach in all directions. (R. at 183.) He imposed no visual or communicative limitations, but found that Owens should avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 183-84.)

Owens was again seen at Tri-County from June 16, 2003, through April 6, 2004. (R. at 240-44.) Again, it appears that these visits consisted primarily of medication checks and refills. (R. at 240-41, 243-44.) In April 2004, Owens complained of pain in the lower back and swelling of the legs. (R. at 244.) His medications were refilled. (R. at 244.)

Dr. Gary Parrish, M.D., a state agency physician, completed a physical assessment on August 25, 2003, concluding that Owens could perform light work. (R. at 216-22.) Dr. Parrish further found that Owens could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 218.) He imposed no manipulative, visual, communicative or environmental limitations on Owens. (R. at 218-19.) Dr. Parrish concluded that the medical evidence established medically determinable impairments of degenerative disc disease and COPD. (R. at 221.) Dr. Parrish found Owens's

subjective allegations only partially credible. (R. at 222.)

X-rays of the lumbar spine taken on April 22, 2004, showed very mild degenerative changes at the lumbosacral region associated with minimal splinting to the right, likely related to muscle spasm. (R. at 239.)

I first note that, in his decision, the ALJ explicitly stated that he was considering all of Owens's impairments in reaching the determination that Owens was not disabled. (R. at 22.) Moreover, the ALJ's decision reveals that he thoroughly considered all of the evidence relating to both alleged physical and mental impairments. As the ALJ found, and as supported by substantial evidence, Owens suffers from cervical radiculopathy, degenerative osteoarthritis of the left shoulder, degenerative disc disease of the lumbar spine and COPD. Furthermore, the restrictions imposed on Owens's work-related physical abilities by both the treating and nontreating sources are taken into account in the ALJ's physical residual functional capacity determination. Lastly, I note that, even though there is evidence from state agency physician Dr. Williams that Owens could perform a reduced range of medium work, the ALJ, nonetheless, concluded that Owens could perform only a reduced range of light work. (R. at 25.)

For all of these reasons, I find that substantial evidence exists in the record to support the ALJ's failure to find that Owens suffered from a severe mental impairment. I further find that the ALJ properly considered all of Owens's impairments in combination in making the physical residual functional capacity determination and in concluding that Owens was not disabled.

*III. Conclusion*

For the foregoing reasons, Owens's motion for summary judgment will be denied and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:   This 13th day of October, 2005.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE